PAUL W. PERKINS v. CHICAGO, MILWAUKEE & ST. PAUL
RAILWAY COMPANY.[1]

February 8, 1924.

No. 23,762.

**Witness competent to give opinion as to speed of train.**

1. Where one in charge of an auto bus, traveling in a foggy night over a railway crossing having five tracks, stops the bus and walks ahead to a point between the second and third tracks, looking for approaching trains, and then runs back to the bus, which proceeds at a speed of about four miles per hour, and the person looks to his right at a headlight of a standing train, on the third track, headed toward the crossing, and watches for approaching trains from the right, and turns as he is nearing the last track and sees the headlight of a train 100 or 125 feet away coming from the left, which collides with the bus, he is a competent witness to give an opinion as to the speed of the train, and the probative value of such testimony is for the jury.

**Testimony that he listened and heard no bell or whistle sufficient for issue to go to jury.**

2. Under the above circumstances the testimony of the same witness testifying that he listened for approaching trains and did not hear any bell or whistle has probative value sufficient to take the issue to the jury, although other witnesses testified that such signals were given.

**Negative evidence substantially affirmative.**

3. Such evidence while negative in form is affirmative in substance.

**Whether flagman is required question for jury.**

4. Cotton v. Willmar & S. F. Ry. Co. 99 Minn. 366, followed. Whether a particular crossing is of such character as to require the maintenance of a flagman is a question for the jury.

[1]Reported in 197 N. W. 758.

**No error in admission of letters.**

5. Evidence examined as to the admission of certain correspondence and found that the same having been received and used only for a limited purpose, there was no harmful error.

**Time table admissible as evidence as to speed of trains.**

6. A time table is admissible in evidence as bearing upon the speed of trains.

**Probable speed of second section of regular train.**

7. The running time of a regular train is competent as bearing upon the probable speed of a second section of such train at the time of the collision.

**Evidence admissible as to traffic over crossing at other times.**

8. When the collision occurred between 11 and 12 o'clock at night, it was proper to receive evidence as to the traffic over the crossing at other hours of the day.

**When written statements of witnesses admissible for impeachment.**

9. When witness L has made a written statement of the collision and then testifies at the trial substantially to the same effect, and is contradicted by witness A, it is proper for impeachment purposes to put in evidence the written statements of both witnesses when the statement of A is inconsistent with his testimony and when he therein says that he has read the statement of L and that it is correct.

**Charge to jury.**

10. Record examined as to assignments of error relating to charge to jury and found without error.

**Question of contributory negligence for the jury.**

11. Under the circumstances above stated, it cannot be said that the plaintiff (through his employe in charge of the bus) was guilty of contributory negligence as a matter of law; that was a question for the jury to determine.

Action in the district court for Pine county to recover $3,000 for damages to an automobile bus caused by negligent management of defendant's train. The case was tried before Searles, J. who denied defendant's motions for a directed verdict, and a jury which

returned a verdict for $1,975. From an order denying its motion for judgment notwithstanding the verdict or for a new trial, defendant appealed. Affirmed.

*F. W. Root, C. O. Newcomb* and *A. C. Erdall,* for appellant.

*Hurley & Hurley,* for respondent.

WILSON, C. J.

Plaintiff sued to recover $3,000 for alleged damages to his auto bus which was struck by one of defendant's passenger trains on a crossing at Newport, Minnesota. The trial resulted in a verdict for plaintiff in the sum of $1,975. Defendant made a blended motion for judgment or for a new trial, and from an order denying the same has appealed.

The negligence charged is: (1) Speed of train; (2) failure to ring bell or blow whistle; and (3) failure to have a flagman at crossing.

The railroad tracks at Newport run approximately north and south and the highway between St. Paul and St. Paul Park parallels the railroad track on the west side from St. Paul Park to Newport and then makes a right-angle turn to the east and crosses the track, where the highway again turns at a right angle to the north and parallels the railway track on the east side to Red Rock, a point just one mile north of the crossing in question. Five tracks intersect the highway at right angles. The turn in the highway in going towards St. Paul is 145 feet west of the first track, known as the industry track. The next track to the east, known as the packing company track, is 45 feet and 8 inches east from the industry track. The west bound main track is 16 feet east of the packing company track. It is 13 feet from the west bound main track to the next track east, known as the west bound passing track, and is 65 feet from the last mentioned track to the east bound main track, the track on which the accident in question occurred.

The depot is located north of the highway between the west bound passing track and the east bound main track. A flagman's shanty is located between the same track but south of the highway. The depot is 21½ feet wide. The nearest edge of the depot is 24 feet west of the center line of the east bound main track, or, in other

words, the east side of the depot is about 21.6 feet from the westerly rail of the east bound track. A portico extends from the south end of the depot to within 13 feet of the north edge of the highway, while the depot proper is 31 feet north of the north edge of the highway.

Aside from the depot building there was little, if any, obstruction of the view northerly from the crossing. This collision occurred at about 11:55 p. m. on November 29, 1921, as the bus was being driven easterly over the crossing and the train was going south; there was a fog at the time, but the witnesses differ as to the extent or density thereof.

In reference to the speed of the train, the witness La Vasseur, who was in charge of the bus, and who was in the bus near the driver at the time of the accident, testified that he saw the approaching train 100 or 150 feet away. Practically all he could see was the headlight. He said the train was coming 40 or 45 miles per hour. Appellant contends that under the circumstances the witness was not qualified to testify to the speed of the train and cites the case of Nelson v. Northern Pacific Ry. Co. 119 Minn. 347, 138 N. W. 419, wherein this court, in discussing the question as to whether a decedent was guilty of contributory negligence as a matter of law, said [at page 350]: "It is a well-understood fact that a person cannot, with any degree of accuracy, judge of the distance of an approaching train when the only guide is the headlight of an engine." This quotation relates to distance rather than speed, but this language is a mere expression of judgment as to a fact and is not stated as a rule of law. The Nelson case recognizes such facts must be determined by the jury. The probative value of La Vasseur's testimony was for the jury to determine.

In the instant case the witness, as to speed, is corroborated by circumstances such as the fact that this is a fast train between the cities and Chicago, the effect its blow had upon the bus, its radiator being torn off and thrown 75 feet and the starting crank being found 450 feet away. Defendant's witness put the speed at from 25 to 30 miles per hour. The division superintendent of the company testified that the running time of this train between St.

Paul and Hastings, a distance of 19.6 miles, was 22 minutes. This may be based on leaving time from Hastings, which would make it 21 minutes, or an average of about 53.45 miles per hour. Defendant's evidence indicated that there was an upgrade of from about 3 to 5 percent going from St. Paul to Newport and then downgrade to Hastings. We think there was evidence tending to show excessive speed, under all the circumstances, and the credibility of such evidence was for the jury. Zenner v. Great Northern Ry. Co. 135 Minn. 37, 159 N. W. 1087.

The witness La Vasseur testified that when he approached this crossing he stopped the bus near the first track, and then for the purpose of ascertaining if any train was approaching, walked ahead to a point between the second and third tracks, to a point about 80 feet from the last track, where the collision later occurred, and there looked and listened, and, discovering no evidence of an approaching train, he then ran back to the bus and got in and caused it to proceed. He testified that he saw a headlight of an engine attached to a train standing about 100 feet south of the crossing and facing north; and that he listened for trains and looked and did not hear any bell or whistle; that he could see nothing indicating an approaching train; that the night was very foggy; that they proceeded at about 4 miles per hour and as they reached the last track the collision occurred. The plaintiff's claims are disputed by witnesses, leaving the controversy to be determined by the jury. The windows of the bus were frosty and it was difficult for those in the bus to see out, and the windows were closed. The ventilator in front was open, giving a limited opportunity for vision into a night, part at least dimmed by fog, and it also permitted in a limited way the hearing of noises outside.

Appellant now says that the testimony of La Vasseur, to the effect that he did not hear the bell or whistle, was negative only and of no probative force against the positive evidence that is opposed to it. True, that where a witness merely says that he did not hear a bell or whistle, it is of little value, but where it also appears that the witness was of normal ability to hear and was in a position and under conditions where he would probably have

heard the sound had it been made, and that he was listening to hear the sound, then it becomes of probative value. The position and situation of the witness, the attention he was giving, and the credibility and weight of his evidence, are questions for the jury. Such evidence, while negative in form, is affirmative in substance. There is no inherent weakness in this kind of knowledge. Cotton v. Willmar & S. F. Ry. Co. 99 Minn. 366, 109 N. W. 835, 8 L. R. A. (N. S.) 643, 116 Am. St. 422, 9 Ann. Cas. 935; Cornell v. Great Northern Ry. Co. 112 Minn. 341, 128 N. W. 22; Zenner v. Great Northern Ry. Co. 135 Minn. 37, 159 N. W. 1087; Willett v. Great Northern Ry. Co. 154 Minn. 10, 191 N. W. 260.

The rule is stated in Cotton v. Willmar & S. F. Ry. Co. supra [99 Minn. 368], thus:

"The allegation being that the ball was not rung it was competent to prove the negative fact by the testimony of competent witnesses who were so situated that they might, and probably would, have heard the sound had the bell been rung. The plaintiff alleged, and was required to prove, that the bell did not ring. The fact in issue was whether at a certain time and place certain sounds were produced. Silence is as much a fact as sound and the proof of one disproves the other. If a witness heard a sound the necessary implication is that he was where he could hear the sound, but the fact that a witness did not hear a sound carries with it no such implication. Therefore when it is sought to prove the nonexistence of sound by the testimony of witnesses the conditions essential to the competency of the evidence must be supplied. The probative value to be given to the fact that a witness did not hear the sound depends upon the condition of his senses, his proximity to the place, the degree of attention, and other such circumstances which render it more or less probable that, if the sound had been made, the witness would have heard it. Hence the mere statement of a witness that he did not hear a bell ring is valueless as evidence, unless it further appears that he was able to hear and was in a position and under conditions where he would probably have heard the sound had it been made. The degree of attention will affect

the value of the evidence, but the fact that the witness was not giving his direct attention at the time for the purpose of learning whether signals were given will not destroy the value of the evidence if he was present at the crossing, was conscious, and in the possession of his ordinary senses, and testifies positively that he heard no signal."

It is plain, therefore, that plaintiff's evidence was sufficient to carry the responsibility for the determination of the facts to the jury, and there is evidence to justify the determination of that question favorably to the plaintiff.

The court submitted to the jury the question whether ordinary care required the maintenance of a flagman at this crossing at the time of the collision—and permitted the jury to find that the absence of such precaution was negligence. Such failure may be negligence. Hollister v. Hines, 150 Minn. 185, 184 N. W. 856; Zenner v. Great Northern Ry. Co. 135 Minn. 37, 159 N. W. 1087; Hume v. Duluth & I. R. R. Co. 149 Minn. 245, 183 N. W. 288. A flagman is kept at this crossing from 7 o'clock a. m. to 11 o'clock p. m. Among the 5 tracks at this crossing, 2 are main lines and constitute main lines of the Chicago, Burlington & Quincy, the Chicago, Rock Island & Pacific, and the Chicago, Milwaukee & St. Paul Railway companies. About 82 trains are operated over this crossing daily. On the day of this accident, 22 trains passed over between 6 o'clock p. m. and midnight, 19 of which were through trains; and, between 11 o'clock p. m. and midnight, 6 trains passed over this crossing. There is testimony to the effect that a great many trains pass after 11 o'clock at night. Not many trains stop at Newport. There are switching operations over this crossing. Automobile and other traffic over the highway is heavy. This highway is a gravel road but connects with paving about one mile to the north. It is used extensively after 11 o'clock at night, and is a main highway between St. Paul and Hastings and other river towns to the south. The evidence was such as to compel the court to submit this question to the jury and it did so, and, like the prior questions, it must be controlled by the composite judgment of the 12 persons in the jury box.

The plaintiff, over the objection of defendant, was permitted to put in evidence some correspondence of the Minnesota Railroad and Warehouse Commission between the village authorities of Newport and certain railroad officials relative to a second flagman at this crossing. This consisted of a communication from the village, dated October 28, 1919, pointing out that but one flagman was used and he only up to 6 o'clock p. m. and seeking more efficient guarding of the crossing during the evening and night hours. A letter from the commission addressed to Mr. J. H. Foster, General Superintendent Chicago, Milwaukee & St. Paul Railway Company enclosing a copy of the communication from Newport in part said:

"In view of the fact that the crossing referred to is protected in the day time the Commission feels that it is only necessary to call your attention to the fact that a number of trains pass over this crossing about 6 o'clock in the evening, and protection should be furnished, and is of the opinion that another flagman should be engaged so as to take care of the situation from 6 o'clock to midnight."

Replying thereto, J. H. Foster, General Superintendent, on stationery of the U. S. Railroad Administration, on November 18, 1919, wrote the commission including this:

"We have made a request that crossing protection be given at the Newport crossing between the hours of 7 a. m. and midnight. Heretofore the protection has extended between 7 a. m. and 6 p. m. with one hour out for lunch."

It appears that while the Federal government took over the railroads it employed Mr. Foster as District Manager or General Superintendent. This correspondence was put in evidence for the purpose of bearing upon the knowledge of defendant as to the circumstances under which the night flagman was put on duty on this crossing. This correspondence was brought to the attention of defendant's superintendent of this division and when the government returned control to defendant, its superintendent became familiar with the arrangements made for this second flagman and it has continued to retain him ever since. This correspondence was offered to show knowledge on the part of defendant of the danger-

ous condition of this crossing prior to the collision. It was not claimed that this evidence had any probative force for any other purpose.

It is rather difficult to see any necessity for the purpose for which it was offered because the defendant, using this crossing so extensively, would be charged with notice of the existing conditions. However, the only part of this evidence that might be objectionable is the suggestion in the letter from the commission, which was signed by the then assistant secretary, that the commission is of the opinion that another flagman should be engaged so as to take care of the situation from 6 o'clock to midnight. It was not claimed, however, that this correspondence had any tendency to prove the necessity for the night flagman; no hearing was had by the commission, this suggestion was obviously a superficial opinion, and it appears from the oral argument that this evidence was not used for any purpose in the case other than to bring notice to defendant which would lead it to learn the actual conditions at the crossing relative to the necessity for another flagman. If this evidence had been misused, after it was received, it might have been made to appear objectionable, but, under all the circumstances of this case, we think that, in the limited way in which it was received and used, it was not reversible error; and, if error, it was harmless. Being used in the trial of the case in this restricted sense, it is of little significance whether Mr. Foster was employed, at that time, by the government or by defendant. The letter from the commission was to him as an official of defendant. This is not an action to recover from defendant for any act or default of the Federal government during its control.

It is claimed that it was error to permit the plaintiff to put in evidence a page of Exhibit E, being a time table issued in April following the accident in November. This was competent in connection with the testimony of the witness Mr. D. E. Rossiter, Superintendent of the River Division of defendant. It is claimed that plaintiff should first have proved that the folder was in effect at the time of the accident. That information was exclusively with defendant, and, if the credibility of this folder was weak, defendant

could have readily shown it. It was admissible in evidence and practically adds nothing to the testimony of the witness. It was issued by defendant to the public and was admissible in evidence. Shaber v. St. Paul, M. & M. Ry. Co. 28 Minn. 103, 109, 9 N. W. 575.

We think it proper to show the regular running time of train No. 16, of which the train in the collision was the second section, as bearing upon the probability of the speed of the train, involved at the time of the collision.

No error resulted from the reception of evidence relating to traffic at times other than between 11 and 12 o'clock p. m. This evidence characterized this crossing and was only incidental to the proofs as to the time after 11 o'clock but, among other things, it showed the opportunity of late or delayed trains and extra trains incident to an enormous railway traffic.

The witness Adams, called by defendant, gave testimony that was not in harmony with plaintiff's witness La Vasseur. On cross-examination Adams said he had signed a statement shown him as Exhibit M. This exhibit included this statement: "I have read Thomas La Vasseur's statement and it is correct." Exhibit N, which was the La Vasseur statement referred to, and which was substantially the same as his testimony, was produced and offered for impeachment purposes. It was in conflict with the testimony of the witness Adams and was properly received in evidence.

Several assignments of error are made in reference to the charge of the court and its refusal to give a number of requests. Some of these assignments, such as 18, 20 and 23 sought to exclude from the consideration of the jury the "condition of the atmosphere as to fog." We find these assignments without substantial merit. The charge as given was free from technical language, plain, concise and clearly covered the questions submitted to the jury.

It is also urged by defendant that plaintiff was guilty of contributory negligence as a matter of law. We do not think this case comes within the case of Anderson v. Great Northern Ry. Co. 147 Minn. 118, 179 N. W. 687, and Jensen v. Minneapolis, St. P. & S. S. M. Ry. Co. 154 Minn. 414, 191 N. W. 908.

Of course the presence of the 5 tracks was a warning. Some care and caution was concededly exercised, and when we bear in mind that La Vasseur, as the bus advanced, was looking to the south, watching the headlight on the standing train about 100 feet to the south on the west bound main line, and observing the possibility of the approach of other trains from the south, and the existing fog, and the evidence as to the distance the headlight was visible in the fog, frosty windows and depot obstruction of view, alleged absence of warning, the speed of the train from the north (eastbound), a midnight collision, we think that the circumstances are such as necessarily carry the case to the jury. Butterfield v. Chicago, R. I. & P. Ry. Co. 193 Iowa, 323, 185 N. W. 151; Hines v. Chicago, M. & St. P. Ry. Co. 196 Iowa, 109, 194 N. W. 188; Jenkins v. Minneapolis & St. L. R. Co. 124 Minn. 368, 145 N. W. 40; Laurisch v. Minneapolis, St. P. R. & D. E. T. Co. 132 Minn. 114, 155 N. W. 1074; Regali v. Minneapolis, St. P. & S. S. M. Ry. Co. 152 Minn. 407, 188 N. W. 1003; McCarthy v. Chicago, M. & St. P. Ry. Co. 154 Minn. 350, 191 N. W. 819.

The condition of the brakes on the bus was a controverted question and the credibility of the evidence in reference thereto was exclusively for the consideration of the jury.

The order of the trial court is affirmed.