## HOWARD FORDE v. NORTHERN PACIFIC RAILWAY COMPANY.[1]

February 19, 1954.

No. 36,091.

---

[1]Reported in 63 N. W. (2d) 11.

248

*Herbert E. Olson* and *Romaine Powell,* for appellant.

*M. L. Countryman, Jr., Earl F. Requa,* and *W. S. Lycan, Jr.,* for respondent.

MATSON, JUSTICE.

Appeal from an order granting defendant's motion for judgment notwithstanding the verdict.

This personal injury action, brought by a front-seat automobile passenger, arises out of a collision between an automobile and a passenger train which was backing up over a railway crossing in the city of Bemidji where Midway Drive, a four-lane concrete highway of a width of 40 feet, intercepts a main-line railway track and a switch track. Although the directions are not exact according to the points of the compass, it may be assumed for the purposes of this decision that the four-lane highway runs north and south and the main track runs generally east and west. The main track crosses the highway at approximately right angles. To the east of the highway the switch track branches off the north side of the main track, runs northwesterly at an angle across the highway, and then proceeds to defendant's Bemidji railway depot. The two tracks resemble the letter Y, the southerly fork and the lower stem thereof being in direct alignment with each other as part of the main track and the switch track constituting the northerly fork. On the east edge of the concrete highway the switch track is 60 feet north of the main track, but on the westerly edge of the highway the two tracks are 90 feet apart.

There is a slight curve in the highway and a moderate upgrade (1.9 percent grade) as one approaches the crossing from the south, but neither the curve nor the grade in any manner obstructs the view from approaching trains and vehicles. The immediate area is not heavily populated, and the few residences and commercial build-

ings in the vicinity are either so positioned or at such a distance from the crossing as to leave the view unobstructed whether one approaches from either the south or the north. In fact the only obstruction to a full view are a few scattered light and telephone poles. The crossing surface with respect to both tracks is a smooth expanse of highway concrete and the tracks are almost flush with its surface. The four-lane highway carries into and through Bemidji the motor vehicle traffic from U. S. trunk highways Nos. 2, 71, and 371. The crossing is equipped with Griswold signals consisting of a crossbuck sign, a rotating stop sign, and two flashing lights to protect and warn motorists approaching from either direction. Southeast and southwest of the crossing lie the areas of Bemidji known as Nymore and Mill Park. About a mile to the northwest lies Bemidji proper. Although trains have for some years customarily traveled over the crossing at a speed of 10 to 15 miles an hour, a Bemidji city ordinance, enacted in 1905 before the crossing area was a part of the city, restricts train speeds on all crossings within the city to six miles per hour.

At 11 p. m. on the night of July 5, 1949, the plaintiff, Howard Forde, was riding in the front seat of a car driven by Marlin Johnson. Although they had done some drinking, it does not appear that either was intoxicated. Johnson was driving the plaintiff home. They turned right onto Midway Drive several blocks south of the crossing and approached the crossing. Both insist that as they approached the crossing they made deliberate observations of the Griswold traffic signals and that said signals were at no time in operation and, furthermore, that they did not see any train approaching. They reached the crossing, passed a bus which was stopped at the crossing next to the curb, and entered the railroad right of way at the speed of 15 miles per hour. At that moment a passenger train consisting of seven cars was backing up from the west on the switch track and had just entered the crossing at about 10 miles per hour. The auto crossed the *main* track, proceeded 60 feet north, and as it crossed the switch track was struck by the rear of the train. Neither Johnson nor Forde saw the train before it hit them. After the impact, the train carried the car

60 feet 10 inches down the track before stopping. Witnesses, other than plaintiff and Johnson, testified that they saw the crossing signals in operation at all times as the train and automobile approached the crossing. It is admitted by the plaintiff that the signal lights were flashing immediately after the accident.

The jury awarded plaintiff $20,000 as damages for the injuries he sustained. Plaintiff appeals from the trial court's order granting defendant's motion for judgment notwithstanding the verdict. Issues which require determination relate to the validity of the Bemidji ordinance restricting train speeds to six miles per hour at crossings and to the alleged negligence of the defendant.

It is admitted that defendant in backing its passenger train at a speed of approximately 10 miles per hour violated the ordinance which restricts train speeds to six miles per hour. Is the ordinance as applied to the crossing herein unreasonable and therefore void as defendant contends and as the trial court found? In passing on the question, we are governed by the following three fundamental propositions:

(a) The object of a police-power ordinance restricting speed at a train crossing is the safety of the public which is paramount to all considerations of private interest or benefit.[2]

(b) A speed ordinance is prima facie valid as a police-power measure reasonably necessary for the protection of life and property, and it is not to be declared void unless and until it clearly and manifestly appears that its restrictive provisions are so patently unnecessary and unreasonable for insuring public safety that, at the time its validity is challenged, it constitutes an abuse or arbitrary exercise of discretion.[3]

(c) Whether with respect to a particular crossing a certain speed ordinance is unreasonable and void is a question for the court—and not for the jury—to be determined in the light of all the circumstances peculiar to the crossing[4] including, among other

---

[2]Evison v. C. St. P. M. & O. Ry. Co. 45 Minn. 370, 48 N. W. 6, 11 L. R. A. 434.

[3]Evison v. C. St. P. M. & O. Ry. Co. *supra*.

[4]Evison v. C. St. P. M. & O. Ry. Co. *supra*.

things, the adequacy of the warning devices maintained to give travelers timely notice of approaching trains.[5] What is a reasonable speed restriction for a crossing is to be adjudged in the light of the generally recognized and prevailing requirements and habits of modern travel and not according to the circumstances and standards of a long-ago yesterday.

■ In applying these principles to the instant case, we are at once confronted with these facts regarding the crossing: (1) It is a busy crossing which is the scene of fairly heavy, but not dense, traffic as the recipient of intercity travel as well as travel from three trunk highways; (2) the crossing surface, embracing the width of a four-lane concrete highway, is in excellent condition for the efficient operation of automobiles; (3) within a reasonable, if not extensive, safety zone area, there is, except for a few scattered telephone and light poles, an entirely unobstructed view of the crossing for drivers and passengers in approaching vehicles; (4) although the crossing is within the city, the immediately surrounding area is not populous so as to constitute a contributing hazard to travel; and (5) the crossing is equipped with a modern Griswold warning system consisting of reflector crossbuck signs on each side of the crossing which automatically face oncoming traffic when a train approaches. The standards supporting these crossbuck signs are also each equipped with two conspicuous alternately flashing red lights and a ringing bell which, when a train approaches, are automatically set into operation by electricity; and if for any reason the regular electric current fails, the operation of the signals is instantly taken over by batteries. In Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579, 154 A. L. R. 206, where a similar automatic signal system is described with more particularity we held, as we must here, that in view of the efficiency of the warning devices employed the crossing could not be considered other than protected to the utmost extent required by reasonable care.

In view of the nature of the crossing, the surrounding circumstances, and the efficient manner in which it is protected by an

[5] Lang v. C. & N. W. Ry. Co. 208 Minn. 487, 295 N. W. 57.

automatic signal system, we can only conclude that the ordinance restricting train speeds to a maximum speed of six miles an hour is wholly unreasonable and therefore void. Clearly, all other things being equal, the automatic signal system with its safeguards against failure provides a safety factor which of itself justifies a higher speed than was thought reasonable in an era when efficient automatic warning devices were unknown.[6] Improved roads, modern vehicles, new safety devices, and the demands of modern transportation generally, have made higher speeds not only reasonably necessary but have so accustomed people to the requirements of speedier transportation that no motorist today, in the exercise of reasonable care, would consider or find an approximate train speed of 10 miles per hour at an open crossing hazardous when such crossing is equipped with an automatic light and bell system to warn him of approaching trains.

Plaintiff contends, however, that a jury question exists as to whether the automobile crossing signals were operating as he approached the crossing. Plaintiff and the driver of the automobile in which he was riding both said that they deliberately looked at the crossing signal standards as they proceeded toward, and as they entered upon, the crossing and that at no time were any of the red signal lights working. Such negative testimony based upon an attentive and purposeful observation by a credible witness in full possession of his faculties, when the observation is made from a position where he reasonably ought to have heard or seen the signals toward which his faculties of hearing and seeing were consciously directed, though negative in form is affirmative in substance and therefore is an evidentiary factor which may be given probative weight by the fact finder as a basis for a finding that the signals were not operating.[7]

---

[6]See, Annotation in re speed of trains at highway crossings and effect of signal systems in 154 A. L. R. 212, 235.

[7]Cotton v. Willmar & Sioux Falls Ry. Co. 99 Minn. 366, 109 N. W. 835, 8 L.R.A.(N.S.) 643 (a leading case); Perkins v. C. M. & St. P. Ry. Co. 158 Minn. 184, 197 N. W. 758; 10 Minn. L. Rev. 543; 2 Wigmore, Evidence (3 ed.) § 664; 7 Dunnell, Dig. (3 ed.) § 3238; 44 Am. Jur., Railroads,

The testimony of plaintiff and the driver was in a certain sense corroborated by the purely negative testimony of Melvin L. Tobey and Dale Shepard who occupied an automobile approaching from a distance of about 500 feet north of the intersection. Between the Tobey car and the crossing was another vehicle. Tobey, who was looking ahead and watching the road as he approached the crossing, testified that he was pretty sure the signals were not working because he would have seen them if they had been. It is significant that Tobey did not even see the signals operating after the accident, although it is admitted they were then working. Shepard, riding with Tobey, said that he didn't notice any flashing signals before the accident but that such signals could have been operating although he felt he would then have seen them. Although purely negative testimony regarding the signals (not to be confused with testimony which is negative only in form but affirmative in substance) may in certain cases have significant probative value because of peculiar surrounding circumstances which make it highly unlikely that functioning signals would not have been seen or heard,[8] such is not the case here under the existing circumstances and in the face of the overwhelming positive evidence to the contrary.[9] It may be assumed that it is true that Tobey and Shepard did not see any flashing signals; but that fact alone under the circumstances does not prove that the signals were not operating since both witnesses were preoccupied inside an automobile, with another vehicle between them and the crossing, and they had not yet reached an immediate zone of danger which demanded purposeful observation.

Since the entire evidence must be considered, and since not every conflict of evidence gives birth to a jury question,[10] we turn to the positive evidence that the signals were at all times operating. Defendant's employees; namely, the conductor who was stationed

---

§ 629; 20 Am. Jur., Evidence, §§ 1186, 1187; Annotations, 162 A. L. R. 13, 98 A. L. R. 161, 140 A. L. R. 530.

[8]See authorities cited in preceding footnote.

[9]Engberg v. G. N. Ry. Co. 207 Minn. 194, 290 N. W. 579, 154 A. L. R. 206.

[10]Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637.

on the platform of the rear car, the engineer, the switchman, and a brakeman, all testified that the signals were operating both before and after the accident. In corroboration of the positive evidence given by defendant's employees, we have the testimony of five wholly disinterested witnesses. The bus driver and his wife, who occupied a bus which had stopped at the crossing and which was passed by plaintiff's car, both saw that the red flashing lights were working prior to the collision. Another couple, Mr. and Mrs. Barnett, who a little earlier had taken Mrs. Barnett's mother to catch the passenger train and who had gone to the crossing to wave at her as the train passed by, were parked about 10 or 15 feet from the crossing, and they both saw the red signal lights in actual operation. Another wholly disinterested witness was a train passenger who was facing to the rear in the lounge car—the last car—as the train backed up to the crossing, and he saw the signals operating at all times.

In addition to this compelling positive testimony, especially from the wholly disinterested witnesses, we have certain corroborative physical evidence. In the first place a regular inspection made a short time prior to the accident, as well as one made afterward, disclosed the signals were in good working order. Furthermore, it is admitted that the signals were working immediately after the accident. As already noted, the automatic signal system embodied safeguards against power failure. We have not overlooked the testimony of a local electrician—who had made only a cursory, or merely a sight, examination of the signal lights and who admittedly did not know how the automatic signal mechanism worked—that vibration might temporarily cause a light to cease burning if the bulb had a loose connection or a broken filament. This testimony is purely speculative and has no probative value whatever. Each side of the crossing was protected by two flashing red lights—visible to traffic from either direction—and it is wholly unlikely that all four bulbs would have loose connections or broken filaments and that all four would temporarily cease burning and then simultaneously resume burning when the collision was over. In the light of the evidence as a whole, and in the face of the overwhelming and convincing tes-

timony of defendant's employees as corroborated by several wholly disinterested witnesses, and as further corroborated by physical evidence, the testimony of plaintiff and the driver, Johnson, to the contrary could not reasonably be accepted as a basis for a finding that the signal lights were not working, and any such finding would be clearly erroneous. See, Hanson v. Homeland Ins. Co. 232 Minn. 403, 45 N. W. (2d) 637; Rule 52.01 of Rules of Civil Procedure; 2 Youngquist & Blacik, Minnesota Rules Practice, p. 648.

■ It is further asserted that the trial court erred in granting judgment notwithstanding the verdict because a jury issue existed as to whether the defendant was guilty of "wilful and wanton negligence" which has been defined as a failure to exercise ordinary care after discovering another in a position of peril.[11] It is elementary that a train has the right of way at crossings and that the train crew may properly assume that a driver of an automobile approaching a crossing will exercise care and stop; they need not themselves stop or reduce the speed of the train until it becomes apparent to them that the automobile driver will not stop and that a collision is therefore imminent.[12] Arthur Thoe, the conductor who was standing on the rear platform of the last car blowing the whistle and watching the crossing, testified that he first realized the automobile occupied by plaintiff was not going to stop when it began to cross the main line or the south track which was 60 feet south of the switch track. At that moment the rear end of the train was just entering the crossing and was only approximately 30 feet from the point of impact. At this same moment the evidence as a whole establishes a train speed of 10 miles per hour and an automobile speed of 15 miles per hour. The conductor, at the instant he knew the car was not going to stop, dropped the whistle and applied the brakes so as to "dynamite" the train. He further testified that the brakes did not commence to take hold until the rear car almost

---

[11]See, Bryant v. N. P. Ry. Co. 221 Minn. 577, 585, 23 N. W. (2d) 174, 179, and cases there cited.

[12]Asklund v. Chicago G. W. R. Co. 176 Minn. 214, 223 N. W. 95; Krtinich v. D. M. & I. R. Ry. Co. 206 Minn. 106, 287 N. W. 870; Ohrmann v. Chicago & N. W. Ry. Co. 223 Minn. 580, 27 N. W. (2d) 806.

reached the point of impact. The physical facts corroborate Thoe's testimony that he did everything reasonably possible to bring the train to a full stop after he once discovered that the occupants of the automobile were placing themselves in a position of peril. Scarcely two seconds elapsed for Thoe's dynamiting of the brakes, for the air pressure to set the brakes, and for the last car to reach the automobile. After the instant of collision, the train pushed the car 60 feet and 10 inches down the track before coming to a full stop. Plaintiff asserts that the fact that the train traveled this distance after the moment of impact demonstrates that Thoe did not act with reasonable promptness in applying the brakes after he knew of the peril. John Saltee, the engineer, testified that he believed, although he had made no tests and was not certain of the exact figures, that a train going six miles per hour could be stopped in 15 feet while a train going 10 miles per hour could be stopped within a couple of rail lengths or a distance of about 50 feet. In view of Thoe's testimony that the brakes did not begin to take hold until just before the moment of impact and Saltee's figures that the train would travel about 50 feet before the brakes would bring it to a stop, we find no basis for a finding by the jury that the train crew did not do everything reasonably possible to avoid the collision after it once became apparent that the automobile would not stop. Negligence cannot be inferred from the mere occurrence of the accident. Ohrmann v. Chicago & N. W. Ry. Co. *supra.*

Since there is no basis for a finding of negligence, we need not consider the other issues.

The order of the trial court is affirmed.

Affirmed.