D. F. HOWELL, *Plaintiff in Error*, v. ALBERT E. BLACKBURN, *Defendant in Error*.

En Banc.

Opinion filed June 30, 1930.

*J. B. Hodges* and *R. H. House,* for Plaintiff in Error;

*Sawyer, Surrency, Carter & Keen,* for Defendant in Error.

DAVIS, Commissioner:

The plaintiff in this case instituted an action on the common count for work done and services performed by the plaintiff at the request of the defendant. In the bill of particulars filed in the cause the plaintiff claims the reasonable value of his services as a real estate broker in and about the sale of certain lands of the plaintiff located in Sarasota County; that the plaintiff found a purchaser for said lands; that a contract of sale was signed and entered into; and that a sale was entered into; and that a sale was actually concluded. The case went to trial upon the general issue and a verdict was rendered by the jury in favor of the plaintiff. A motion for new trial was made and overruled and thereupon the court entered a judgment for the plaintiff. It is now here for review upon writ of error.

This Court is committed to the doctrine that "A broker cannot recover for his services unless they were rendered at the express or implied request of his employer. That is to say, in order to recover on his part he must have been actually employed by the person he seeks to hold liable, otherwise there would be no legal basis for his claim to compensation. This is true even though a purchaser be found through information furnished by him." The broker must show not only that he brought the vendor a customer with whom he dealt, but that the service was performed

either at the request of, the vendor or with the mutual understanding that it was not voluntarily proffered and that it was to be rewarded with reasonable compensation. City Builder's Finance Co. v. Stahl, 90 Fla. 357, 106 So. R. 77.

In the early part of May, 1925, the plaintiff (defendant in error) approached the defendant (plaintiff in error) with the purpose of purchasing certain lands to which the defendant held the legal or equitable title and the defendant offered to sell the lands to the plaintiff at the rate of $40.00 per acre.· The plaintiff was at that time known by the defendant to be a real estate broker. Immediately after May 17, 1925, the plaintiff interested one Raymond in the purchase of said lands at $40.00 per acre and on the 19th of May, Raymond delivered to plaintiff a check for $5,000.00, payable to the order of Albert E. Blackburn, Agt., and signed "Summerland Inc., Newman H. Raymond, Pres." This check was endorsed by Albert E. Blackburn and deposited in the Bank of Sarasota by Blackburn on a real estate transaction. The cashier of the bank notified the defendant that the said sum of $5,000.00 was on deposit. On the 21st day of May, 1925, the vendor and Summerland, Inc., entered into a written contract whereby the vendor agreed to sell and the said Summerland Inc., agreed to purchase the said real estate for a consideration therein expressed; and in pursuance of the terms of this contract the title to the lands was later conveyed. The said sum of $5,000.00 which had been deposited in the bank was used as a part of the initial payment for said lands. The above recited facts are undisputed.

The plaintiff, testifying in his own behalf, said that when the defendant offered him the land at $40.00 per acre he was unwilling to give that price, but advised the defendant that he could sell it and that the defendant gave him what he termed a "listing" in words and figures as follows:

"Sarasota, Florida,
"May 16th, 1925.

"3281 acres of land @ $40.00 per acre. One-fourth (¼) cash, balance one (1), two (2) and three (3) years @ 8%. Interest payable semi-annually.

"Five thousand ($5,000.00) dollars binder money to be put in Bank of Sarasota in escrow not later than Thursday, May 21st, 1925.

"If sold—forty-five (45) days is to be given for examining title and deeds from date of presentation of deeds.

"D. F. HOWELL."

Plaintiff further testified that nothing was said about paying him a commission; that after he sold the property he gave the "listing" to Jo Gill, cashier of the bank, who was to hold his commission when the deal was closed and money was taken out of escrow; that he did not try to get Howell to pay the commission prior to the institution of this action which was on the 13th day of September, 1927, or over two years after the closing of the deal. He further testified that he told Raymond that he would divide his commission with his (Raymond's) boys; that he supposed one T. A. Albritton, an associate, would have an interest in the commission, though he had no understanding with him and after deal was closed he told Albritton that the defendant would not pay any commission; that he did not remember a conversation with Miss Vera Roberts, defendant's secretary, on the 20th day of May, when she told him that she had a wire from the defendant to inquire of him (Blackburn) if he and Albritton were going to positively close the deal on the acreage and that he (Howell) had a buyer at a better price and also what amount he (Blackburn) wanted to release defendant from his oral contract

with him (Blackburn) for the sale of the property: but that he recalled that Miss Roberts called him at his home stating that she had a message for him and that he met her in Sarasota; that he did not remember what the message was—"something in reference to the money, whether I had or not put up the money on the deal." If after getting a price on the land, plaintiff communicated with the vendor prior to making the contract with the Summerland Inc., he did not so state. He was present when the contract was made, but did not testify as to whether at this time anything was said about a commission on the sale.

Jo Gill, a witness for the plaintiff, testified that he had in his possession a listing of land signed by D. F. Howell and identified the same (which is copied in this opinion above in full; but did not know whether he got it from Blackburn or Howell; that he had a letter from Howell, dated May 23, 1925, inclosing some kind of agreement.

M. C. Griffin, a witness for the defendant, testified that Blackburn and Albritton called at the office of Howell to get a price on the 3,200 acres of land on the Miakka River and that Howell made them a price of $40.00 net; that the contract between Howell and Summerland Inc., was signed in the office of Howell in his (Griffin's) presence and that Blackburn wanted the contract made out to Summerland Inc.; that Howell agreed to make the contract that way but always told them that the price was the same as it was to start with—"net to him."

Miss Vera Roberts, a witness for the defendant, testified that in May, 1925, she was employed as stenographer for the defendant; that she recalled the transaction between Mr. Howell and Mr. Blackburn in the spring of 1925 with reference to the 3,281 acres on the Miakka River; that on May 20, 1925, the defendant was on the East Coast and that she saw Mr. Blackburn and asked him "what amount

of money would he consider to release Mr. Howell from his verbal agreement to purchase the Miakka River property, and Mr. Blackburn said he would not consider releasing him from his verbal agreement to sell this property and that he placed $5,000.00 in the Bank of Sarasota with Jo Gill in escrow pending an agreement closing up the deal and that he wanted the deal to go through and he would not consider releasing him at all.'' This witness further testified that the agreement between Howell and Summerland Inc., dated May 21, 1925, was drawn in the office of the defendant and that she prepared the written portion of it and that it was executed at that time after the defendant informed Blackburn that he (defendant) would not pay a commission on the deal if it went through to the Summerland Inc., because he thought Blackburn was the purchaser. Miss Roberts further testified to a paper being attached to a letter from Mr. Howell to Mr. Gill, but we are unable to say after reading the transcript what paper she had in mind; in fact it seems that her mind was not clear as to what paper was referred to in the letter.

The defendant testified that he never ''listed'' the lands with the plaintiff for sale, but did agree to sell them to him and Albritton at the price of $40.00 per acre net; that this agreement was verbal; that he never gave to plaintiff the paper which is copied above and referred to as a ''listing.'' that he next saw Blackburn on the 21st day of May and Blackburn stated that he did not want to take the title in himself; that he wanted it made to Summerland Inc.; that he (Howell) told Blackburn that he (Blackburn) was the buyer that that he (Howell) would not pay any commission to anybody on the sale of the property and that after making this statement the contract was entered into with Summerland Inc.; that after the execution of that contract, he did not have any further conference with the plaintiff; that

he made an effort to get the plaintiff to release him from his verbal agreement; that the paper dated May 16, 1925, is a statement he had his stenographer to typewrite in plain English for the sole purpose of giving to Jo Gill in the bank ''for him to know and understand just what this deal was in selling this land''; and that he delivered it to Mr. Gill together with a letter addressed to Mr. Gill's bank which was sent on May 23, 1925, and contained the following language: ''Herewith I hand you real estate agreement between Mr. A. E. Blackburn and myself.''

T. A. Albritton testified in rebuttal that Howell never made a price to him and Blackburn at $40.00 per acre, but said it would be about $20.00 and that he would have to wait until he got it cleared up; that later he was in Howell's office and when he got there Blackburn was there; that he saw Howell go to the typewriter and do some writing ''and handed it to Mr. Blackburn, but I don't know what it was''; that Blackburn told him Howell had raised the price to $40.00 per acre and he told Blackburn he didn't think they could buy it at that price.

We have endeavored to set out in substance only such testimony of witnesses as we deem pertinent to this decision.

We have considered very carefully all of the testimony and it is our opinion that the verdict of the jury is clearly against the weight of the evidence.

The statement of the defendant in error that the vendor gave to him a ''listing'' of the lands is uncorroborated by the statement of any other witness or by any circumstance in evidence. If the alleged listing was ever intended by the vendor to serve the purpose of, and was actually delivered to and was accepted by the defendant in error as, a ''listing'' of vendor's lands for sale, the defendant in error failed to exercise that care and prudence that might be expected of an ordinary business man. As a real estate

broker, he doubtless knew how to protect himself in a real estate transaction; and yet we find him listing lands for sale without having any understanding with the owner as to what commission he is to receive for his services. If the paper which he calls a listing was given to him by the vendor, it would not only have been wise, but common business prudence would have prompted him, to have had it clearly stated therein that the property was being listed with him by the owner and what commission, if any, he should receive for making a sale or finding a purchaser. If this had been done, there could have been no question about the vendor listing his property for sale. As it is the vendor says he did not list his lands for sale with the defendant in error, but that he made a net price to him as a prospective purchaser and that the alleged listing was made for the sole purpose of giving to Jo Gill "for him to know and understand just what this deal was in selling this land," and that it was never given to the plaintiff, but to Gill. The testimony of the vendor is corroborated in a measure by Griffin and Miss Roberts and also by Gill, who admitted that he received a letter from the vendor inclosing a paper which *was* designated as a contract with Blackburn. Gill could not state what contract was referred to, but if he had ever had in his possession any contract other than the said "listing," he did not mention it. Certainly he did not say he had returned any contract to the vendor and the record does not disclose the execution of any contract between the vendor and the plaintiff Blackburn. Circumstances also seem to corroborate the vendor. The plaintiff called upon him not as a broker but as a prospective purchaser and nothing was said about a commission. When the contract with Summerland Inc. was executed, the vendor was willing to make such contract, but he made it clear that the price was net to him and that he would pay no commission. His state-

ment to that effect was corroborated by Griffin and Miss Roberts and neither the plaintiff nor Raymond, though both were present, testified to the contrary. When the vendor through Miss Roberts wanted to buy a release from the "verbal agreement" to sell to the plaintiff, nothing was said by Blackburn about a sale having been made to someone else prior to the making of the contract and the plaintiff never notified vendor that the property had been sold to anyone else. No request or demand was made for a commission at the time of executing the contract to Summerland Inc., or at any other time prior to bringing the action which was two years and about four months after the signing of the said contract.

The failure of the plaintiff to have some agreement or understanding with the vendor as to the payment of a commission and his failure to seek a commission or even suggest that one was due him are circumstances well calculated to shake one's faith in the plaintiff's statement that the property was listed with him for sale. There is convincing logic in the following statement from 1 Moore on Facts, page 222;

"While the testimony of an unimpeached witness is not to be arbitrarily disregarded, it must be measured by the standard of common experience and business usage. The statement that a man under certain circumstances did something which we know from experience not one in a thousand would do under the same circumstances is discredited by the inherent improbability of the statement. It is more rational to believe that the testimony is intentionally or mistakenly untrue than it is to believe that the marvelous occurred."

See also to same effect, Whelen v. Osgoodby, 62 N. J. Eq. 571, 50 Atl. R. 692; Knowles v. Knowles, 86 Ill. 1, 8.

The evidence does not sustain the contention that there was a contract, express or implied, between the plaintiff and the vendor making plaintiff the vendor's agent to effect a sale or procure a purchaser for the said lands. It is probably true that the plaintiff was the cause of the vendor making the sale of this property, but it is a rule that where a broker renders services as a volunteer without authority express or implied the owner is not bound to pay anything for said services. City Builders' Finance Co. v. Stahl, 90 Fla. 357, 106 So. R. 77; Walton v. Clark, 54 Minn. 341, 56 N. W. R. 40; Viley v. Pettit, 96 Ky. 576, 29 So. W. R. 438; Fordtran v. Stowers, 52 Tex. Civ. Ap. 226, 113 So. W. R. 631, 634; Ballentine v. Mercer, 130 Mo. Ap. 605, 109 So. W. R. 1037, 1040-1.

This Court has frequently held that a judgment may be reversed and a new trial granted where the verdict is against the clear weight of the evidence or manifestly against the evidence. Fla. East Coast R. Co. v. Thompson, 93 Fla. 30, 111 So. R. 525; Fla; Tr. & Banking Co. v. Consolidated Title Co., 86 Fla. 317, 98 So. R. 915; Tampa Elec. Co. v. Barber, 81 Fla. 405, 88 So. R. 302; Chambers v. Armour, 78 Fla. 577, 83 So. R. 721; Wilson v. Jernigan, 57 Fla. 277, 49 So. R. 44; Sanderson v. Hagan, 7 Fla. 318; Meinhard v. Lelienthal, 17 Fla. 501.

In the case at bar, the denial of the motion made by plaintiff in error for a new trial is assigned as error. This motion was based upon a number of grounds, among them being that the verdict is contrary to the evidence and that it is not supported by a preponderance of the evidence. Holding as we do that the verdict is against the clear weight of the evidence, the judgment must be reversed and a new trial granted; and entertaining the views that we do on the evidence in the case, we deem it unnecessary to pass upon the questions raised by the other assignments of error.

124

The judgment is reversed and a new trial awarded.

PER CURIAM.—The record in this cause having been considered by the Court, and the foregoing opinion prepared under Chapter 14553, Acts of 1929, adopted by the Court as its opinion, it is considered, ordered and adjudged by the Court that the judgment of the Court below should be and the same is hereby, reversed, and a new trial awarded.

TERRELL, C. J., AND WHITFIELD, ELLIS, STRUM, BROWN AND BUFORD, J. J., concur.