SHANNON, Chief Judge.
The appellant herein was the defendant in the court below, and the appellee was the plaintiff.
The action was brought against the railroad company for the death of Edward Michalek by his widow. It resulted in an $85,000.00 jury verdict for the plaintiff. The defendant filed a motion for judgment in accordance with motion for directed verdict, a motion for new trial, or, in the alternative, for entry of remittitur, which were denied by order of the trial court. The appellant presents us with seven points on appeal, upon each of which it indicates there is reversible error. These points involved: *453 1) the court’s denial of its motion for directed verdict; 2) the court’s denial of its motion for new trial; 3) the court’s denial of motion for entry of remittitur; 4) the court’s admitting into evidence, over defendant’s objection, and in denying defendant’s motion to strike testimony of the witness, Hudson, as to prior acts of neglience on the part of the defendant; S) the court’s admitting into evidence, over defendant’s objection, oral testimony of the witnesses concerning the contents of the defendant’s rule regarding obstruction of crossings; 6) the court’s admitting into evidence, over defendant’s objection, Rules 14 L and 31 of the defendant’s Book of Rules, regarding the transportation department; and 7) the court’s error in charging the jury, over defendant’s objection : “However, it is presumed that the deceased acted with common and ordinary care for his own safety, unless, and until the contrary is made to appear from the evidence.”
The accident in which the deceased was fatally injured occurred at about 4:47 A.M. on August 7, 1956, at the railroad crossing of the. Florida East Coast Railway track and S. W. 33d Street in Fort Lauderdale, Florida. There were a total of seven railroad tracks crossing S. W. 33d Street, said tracks running generally in a northerly and southerly direction, and S. W. 33d Street ran in an easterly and westerly direction. The railroad crossing was protected by automatic flashing signal lights and bells mounted on a standard located in the center of the street on each side of the railroad crossing, on each of which standards there was mounted a reflectorized sign bearing the following words of warning: “Railroad Crossing — 7 tracks — Stop on Red Signal.” Each signal light had a red lense and was approximately eight inches in diameter; there were four such signal lights on each of the two standards, two of each set of lights facing west and two facing east; the lights flashing on and off alternately when in operation. The signal lights were clearly visible to one approaching the crossing from either east or west.
The design and maintenance and the workability of the signal lights and bells are described in appellant’s brief, supported by the record, as: “The signal lights and bells at this crossing were so designed as of the date of the accident, that they would be immediately activated when a southbound train on the southbound mainline track (being the third track from the westerly most track) reached a point 2,040 feet north of the S. W. 33d Street crossing. Once activated at that point by a southbound train, the lights and bells would continue to flash and ring until the entire train passed a point approximately 45 to 50 feet south of the crossing. If a southbound train on the southbound mainline track activated the lights and bells by proceeding over the activation point 2,040 feet • north of the crossing, and then proceeded on south over the crossing, and stopped at a point so that any part of the train was. north of the de-activation point (45 to 50 feet south of the crossing) and then backed up, the lights and bells would continue to¡ operate during this entire time. Of course, if the' southbound train passed the deactivation point (45 to1 50 feet south of the crossing), thus de-activating the lights and bells, and then stopped, and then backed up in a northerly direction across the deactivation point, the bells and lights would be re-activated and begin again to operate when the lead car of the train passed over the point 45 to 50 feet south of the crossing. Once a train reaches the point of activation for the automatic signal devices at this crossing, it takes less than one second for the flashing lights and bells to begin to operate.”
In regard to this particular crossing, some five days prior to the accident in question, a signal inspector for the railroad had inspected all of the flashing lights and bells and the circuits controlling them, in a manner which duplicated that by which a train would activate and operate the said lights and bells. He found as a result that all lights and bells were functioning properly. The circuits, lights and bells were again *454 inspected and tested on the date of the accident at around 7:00 A. M., some two and one-half hours after the accident, by an employee of the railroad, at which time it was again found that the flashing lights and bells were all functioning and working properly.
Immediately prior to his death the deceased was proceeding from the east in a truck and the defendant’s train had come from the north. The decedent’s truck lights were on bright and there were no other vehicles in sight.
The train of the defendant was No. 343, proceeding from Fort Pierce to Miami, and consisted of three diesel locomotives and approximately fifty freight cars. The train approached, southerly, the S. W. 33d Street public crossing on the southbound mainline track. The crew had to set out four of the freight cars of this train on a set-out track north of the 33d Street crossing, being the second track west of the southbound mainline track north of the crossing. In order to set out the four cars it was necessary to make a cut in the train behind the 29th car since the four cars to be set out were near the middle of the train. The procedure by the crew to make this cut-out was as follows: They would stop the southbound train on the southbound mainline track with the 29th car just south of the point where the cut was to be made. Switch-man Donaldson would then make the cut behind the 29th car and they would then pull the train on south past the switch for the set-out track, which switch was located a few feet north of the crossing. Donaldson would then throw the switch, and the engineer would back the train with the cars to be set out in the lead into the set-out track where the cars would be cut from the train. They would then cut the cars to be set off the train, and pull the engines with the remaining cars on south out of the set-out track, throw the switch back so that the engines and attached cars could back up north of the switch and couple onto the cars which had been left north of the switch, and then the entire train would proceed on south to its destination. In the proceeding the engineer had to make a gradual and limited turn and hence at times he could not see the crossing. Therefore, the Trainman, McPhail, had gotten off the train some 400 feet south of the crossing so that he could relay the signals from Donaldson to the engineer of the train. Donaldson lit a fusee (a red flare) as soon as he got off the train and he was also carrying a standard railroad lantern with a white light. After the train stopped Donaldson cut the train behind the 29th car, gave a go ahead signal with the fusee to McPhail, who relayed it to the engineer, and Donaldson then boarded the 29th car and rode it down to where the switch was located, a few feet north of the crossing. Both Donaldson and McPhail during all of this time were standing on the west side of the southbound mainline track. Donaldson got off the train again at the switch and immediately gave a stop signal to McPhail, who relayed it to the engineer, and the train came to a stop with the last car of the train south of the crossing, but still within the signal circuit and the bells and lights were still operating. After putting some waybills in a box he walked back to the west side of the southbound mainline to the pavement where he had laid the fusee. There was no vehicular traffic on S. W. 33d Street coming from either direction during that time or when he got back from where he left the fusee. He then picked up the fusee and stood about four feet west of the southbound mainline track on the north edge of the pavement of S. W. 33d Street. After looking in both directions, both east and west, and seeing no traffic coming from either direction he gave a back-up signal with the fusee to McPhail, who relayed it to the engineer, and the train started backing. The lights and bells at the crossing were still continuing to operate and in fact operated during the entire movement from the time the train first activated them as it came 2,040 feet from the crossing until after the accident occurred, when the train was finally pulled off the circuit. Immediately upon giving the back *455 up signal to McPhail, Donaldson looked to the west and saw no vehicles approaching; he then looked to the east and for the first time saw the headlights of the decedent’s car coming from the east, proceeding west, about one-quarter or one-half block from the easternmost track. There were no other vehicles in sight at that time. Donaldson immediately gave the decedent a stop signal with the fusee and the decedent’s truck came to a stop about six feet east of the easterlymost track. Just as soon as decedent had stopped his truck he started up again and proceeded west across the track as the train was approaching. Donaldson immediately began vigorously giving stop signals with the fusee to the deceased and yelled at him in a loud voice, “Stop, stop, stop.” The truck did not stop but kept on coming accelerating its speed in low gear. Donaldson continued to vigorously give stop signals with the fusee to the deceased as he came across the first four tracks and continued to yell at him until decedent’s truck and the lead car of the train both got to within a few feet of Donaldson, when he turned and ran to the west about 20 feet in order to keep from being struck by decedent’s vehicle. When he started to run he immediately threw his fusee to the ground and the fusee went out almost immediately. As soon as decedent’s truck had started to cross the tracks, Donaldson had given an emergency stop signal to McPhail to stop the train and he immediately relayed it to the engineer, who immediately applied the engine brakes and was reaching for the emergency train brakes when the collision occurred breaking the air hose on the front car of the train and thus throwing the entire braking system into emergency. The train had attained only a speed of approximately five miles an hour when the collision occurred. The engineer on the train had sounded three blasts of the engine whistle and the engine bell was turned on as the backward movement was started, although Donaldson testified that he did not hear the whistle. The stop signals made by Donaldson to the deceased as his truck approached the track and after the truck had stopped were done by waving the fusee in a horizontal movement back and forth across the front of his body in a north and south direction.
We have given a fairly long account of the actual facts of the accident as testified to by Donaldson. As to the actual accident itself there were no eye witnesses other than Donaldson. While there is considerable evidence in this case, the incidents concerned with the actual happening can be sifted down to a very narrow limit.
The plaintiff takes the position that the jury was not required to believe Donaldson and that by the testimony of the two witnesses,' Elmer B. Hudson and Donald B. Reeves, she has created a fact issue sufficient to take this case to the jury. Her argument is that these two witnesses did not see Donaldson at the intersection where the accident occurred when they first came up to the scene. The witness, Donald B. Reeves, a police officer of the City of Fort Lauderdale, Florida, testified:
“Q. Did this man come up and identify himself as being with the railroad ?
“A. This man that I saw that was coming up toward the truck was carrying a lantern.
“Q. Did he tell you what his name was?
“A. Not at that time, no, sir.
“Q. Did he tell you what his name was later?
“A. Yes, sir.
“Q. And what was his name?
“A. Mr. G. E. Donaldson.
******
“Q. Where was he when you first saw him? Could you show the jury on this aerial? First if you would tell us and then show us on the picture?
“A. Well he was approximately midway between myself — between the *456 accident, the scene of the — where the truck had come to its final resting place, at the intersection where the accident took place.
“Q. On which side of the track where the accident occurred was he?
■“A. If you were facing south, as I was, he would be on the left hand side; hut he would be coming north and he would be on his right hand side of the track.
******
“Q. 'So when you first saw this fellow, G. E. Donaldson, you saw him on the east side of the track where the accident occurred?
“A. Yes, sir.”
Mr. Reeves was the first policeman at the scene of the accident and made an investigation. In regard to his report he was asked the following questions and made the following answers:
“Q. Would you tell the jury who is listed as a witness, based on the investigation of this accident?
“A. Mr. G. E. Donaldson, flagman, employed by the F. E. C. Railroad, Miami, Florida.
“Q. Are there any other witnesses listed ?
"A. No, sir. Now that is according to my report. As I said now, the other officers talked to persons. I am not responsible for their report. This is the only report that I have.”
The witness, Elmer B. Hudson, while not an eye witness, was the first witness at the scene of the accident other than the railroad employees. He testified, in part, as follows:
“A. From the west.
“Q. And on the day that this accident occurred were you approaching the plant from that direction?
“A. Yes, sir.
^ ‡ ^ ‡ ‡
“Q. Directing your attention to this particular day, August 7, 19S6, did you actually see the accident?
“A. No, sir.
“Q. Will you tell the jury, Mr. Hudson, in your own words where you were and what you were doing and what you saw?
“A. Well as I came around this particular building here, this corner here, the train had already blocked the crossing and was still moving very slow, and by the time I got up here it had come to a stop and blocked the crossing.
* * * * * *
“Q. That was a vacant lot, built on since then. As you came around this crossing will you tell the jury whether you saw any person, crossing watchman, railroad man, or whatever we want to call him, standing here either in this lane, which is the one on the .north or the south, whether you saw anyone with a lantern or a fusee?
“A. I saw no one at all, no one at all.
“Q. Were there any obstructions here to your vision ?
“A. No, sir.
“Q. Now as you — you didn’t see the accident, the actual impact, did you, sir?
“A. No, sir.
“Q. As you approached here or saw here the train was already going across the crossing, did you say?
“A. Yes, sir.
“Q. Will you tell the jury as you saw them were the signal lights on this side working?
*457 “A. Yes, sir..
^ % ‡ iff ‡ *
“Q. Just the flashing lights. Did you actually see the truck?
“A. No, sir.”
Insofar as the testimony is concerned, Donaldson, a railroad employee, testified in particular to all the facts that went into making this accident. The witnesses for the plaintiff, Hudson and Reeves, did not testify to any of the actual facts at the time of the accident. Their testimony only showed that they did not see Donaldson when they arrived at the scene. So, we have the accident itself happening in a manner testified to hy Donaldson with some support from the plaintiff’s two witnesses. Their corroboration is as to the lights and bells. The collective effect of all the testimony is that at the time that the deceased .approached the tracks, the crossing lights were burning and the bells were ringing, and Donaldson was in the crossing himself with the fusee and lantern, with which he gave the deceased signals to stop. The deceased stopped and then proceeded on and was hit by the train. On those facts was • the trial court justified in sending the case to a jury? We think not.
It is only upon the complete rejection of the testimony of Donaldson that this case should be sent to a jury. A correct statement of the principle that the jury does not have to follow an unimpeached witness is contained in Howell v. Blackburn, 1930, 100 Fla. 114, 129 So. 341:
“ * * * There is convincing logic in the following statement from 1 Moore on Facts, p. 222: ‘While the testimony of an unimpeached witness is not to he arbitrarily disregarded, it must be measured by the standard of common experience and business usage. The statement that a man under certain circumstances did something which we know from experience not one in a thousand would do under the same circumstances is discredited by the inherent improbability of the statement'.It is more rational to believe that the-testimony is intentionally or mistakenly untrue than it is to believe that the marvelous occurred.’ See also, to same" effect, Whelen v. Osgoodby, 62 N.J.Eq. 571, 50 A. 692; Knowles v. Knowles, 86 Ill. 1, 8.”
The Supreme Court reaffirmed this position in Catlett v. Chestnut, 1933, 107 Fla. 498, 146 So. 241, 91 A.L.R. 212, saying:
“Much of the evidence offered in plaintiff in error’s behalf, while uncon-troverted, appears to be discredited in many particulars. Such evidence is not necessarily binding upon a court in the consideration of a motion for a directed verdict. Testimony may be un-impeached by any direct evidence to the contrary, and yet be so contrary to natural laws, inherently improbable or unreasonable, opposed to common knowledge, inconsistent with other circumstances established in evidence, or so contradictory within itself, as to be subject to rejection by the court or jury as a trier of the facts. Brannen v. State, 94 Fla. 656, 114 So. 429. While the testimony of an unimpeached witness is not to be arbitrarily disregarded, and must be measured by the standard of common experience in human conduct or business usage, there may be such an inherent improbability in the statements of a witness as to induce the court or- jury to disregard his evidence, even in the absence of any direct conflicting testimony. * * * ”
The appellee seeks to show the testimony of Donaldson to be contrary to natural laws, inherently improbable and unreasonable; opposed to common knowledge; inconsistent with the other circumstances established in the evidence, or so contradictory within itself as to be subject by rejection by the court or a jury as trier of facts; yet, his testimony taken as a whole is not subject to these vices. There is no inherent improbability in his statements.
*458 As was stated by Judge Wiggington in Kinney v. Mosher, Fla.App.1958, 100 So.2d 644:
“ * * * When uncontradicted testimony consists of facts, as distinguished from opinions, and is not illegal, improbable or unreasonable or contradictory within itself, it should not be wholly disregarded, but should be accepted as proof of the issue.”
There is an abundance of case law to support the direction of a verdict for the defendant, appellant herein, under the particular facts to which we have alluded. In Vincze v. New York Cent. R. Co., 1931, 9 N.J.Misc. 1089, 157 A. 159, a verdict for the plaintiff was reversed by the New Jersey Supreme Court with instructions for a directed verdict for the defendant. In that case the defendant was charged with negligence in failing to give the statutory signals, in that the crossing bell was not operating and that a flagman stationed to give warning of the train’s approach was not performing his duty. The evidence there was much stronger for the plaintiff than in the present case. In Ross v. Missouri Pac. R. Co., La.App.1934, 153 So. 570, a judgment for defendant in a case similar to the present one was affirmed by the Louisiana Appellate Court. In the Ross case, the plaintiff’s automobile was struck by a lead car of 22 freight cars being pushed over a crossing at night, which crossing was not protected by any flashing lights or bells, but was protected by a crossing watchman with a lantern, who attempted to stop the plaintiff before the collision. In affirming for the defendant, the court said:
“Having found that the crossing was properly protected by a brakeman waving a lantern, we conclude that there was no negligence on the part of defendant, and therefore the demands of plaintiff were correctly rejected by the lower court, and the judgment is affirmed, with costs.”
In Keating v. Chicago and Northwestern Railway Co., 1956, 274 Wis. 186, 79 N.W.2d 826, a judgment for defendant on a directed verdict at the conclusion of the trial was affirmed by the Wisconsin Supreme Court, the holding being that the mere placing of a lighted fusee on the pavement of the crossing itself “was adequate warning of the approach and presence of the train * *
In the last two cases the waving of a lantern in the one and the placing of a lighted fusee on the pavement at the crossing in the other were each held to be sufficient warning so as to justify direction of a verdict for the defendant railroad. They were not nearly as strong for the defendant as are the facts in the instant case.
In Bailey v. Erie Railroad Company, D.C.Ohio 1956, 143 F.Supp. 351, which was an action for the death of a pedestrian killed at a crossing, the jury failed to agree upon a verdict and the court then entered judgment for the defendant in accordance with its motion for directed verdict. In this case decedent was killed by defendant’s westbound train while walking across the tracks at a crossing. As he reached the crossing an eastbound train was crossing the second track from the north and as the freight train cleared the crossing the decedent stepped into the first track and was struck by the passenger train. One of the plaintiff’s witnesses said that he did not see the flashing signal light in operation and another witness testified that he did not hear the train whistle until after the passenger train cleared the crossing; while another witness for plaintiff testified that he did not hear the whistle or train bell at all. Notwithstanding this, the court said:
“Decedent would not have been killed had he not walked. on the tracks in disobedience to the warning of the flasher signal lights. The flashing of the lights was warning to him of the immediate approach of a train.
5}C ‡ ‡ ‡ #
“The positive uncontradicted testimony was that the flasher signal lights *459 were operating when decedent approached the crossing. It does not help plaintiff to claim that decedent may not have seen the flasher signal lights. The fact was that the flasher signal lights were there in operation and if plaintiff’s decedent did not see them, he did not look. The railroad company satisfied its obligation when it installed and operated the flasher signal lights. It had no means of compelling the decedent to look at them.”
A particularly interesting case is Forde v. Northern Pac. Ry. Co., 1954, 241 Minn. 246, 63 N.W.2d 11, which was a suit for personal injuries suffered at a railroad crossing at a time when the defendant’s train was backing over the crossing in the nighttime. The plaintiff was riding as a passenger in a car, and both the plaintiff and his driver testified that as they approached the crossing they looked at the signals and they were not in operation and they did not see any train approaching. They passed a bus which was stopped next to the curb near the crossing and then entered the crossing at a speed of about 15 miles per hour. The train entered the crossing at about 10 miles per hour on the switch track. Other witnesses said they say the signals in operation at all times as the train approached the crossing. At the trial plaintiff secured a $20,000.00 jury verdict, but the trial court granted defendant’s motion for judgment notwithstanding the verdict. The Minnesota Supreme Court affirmed, stating:
“ * * * In the light of the evidence as a whole, and in the face of the overwhelming and convincing testimony of defendant’s employees as corroborated by several wholly disinterested witnesses, and as further corroborated by physical evidence, the testimony of plaintiff and the driver, Johnson, to the contrary could not reasonably be accepted as a basis for aj finding that the signal lights were not working, and any such finding would be clearly erroneous. * * * ”
Since we conclude that in the instant case there is no evidence of negligence on the part of the defendant, it was the duty of the trial judge to direct a verdict for the defendant at the conclusion of all the testimony. See Florida East Coast Railway Company v. Davis, 1928, 96 Fla. 171, 117 So. 842. It is not deemed necessary, therefore, to discuss the remainder of the points raised by the defendant in this appeal.
The judgment appealed is reversed and remanded with directions for the entry of judgment for the defendant-appellant.
ALLEN and WHITE, JJ., concur.